Judge Berman

'07 CIV 8819

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF NEW YORK
---------------------------------------------------------------X
JAMES B. LEBOW AND THE LAW OFFICE
OF JAMES B. LEBOW,

                        Plaintiffs,

      - against -

MINTZ & FRAADE, P.C., FREDERICK
MINTZ, ALAN FRAADE, WARREN
PEARL, ROBERT CHIRA, THE LAW
OFFICES OF ROBERT CHIRA AND
ASSOCIATES, and JOHN DOE,

                    Defendants.

COMPLAINT



**Demand for Jury Trial**
---------------------------------------------------------------X

Plaintiff, James B. LeBow, Esq., pro se complains of Defendants, as follows:

## I. PRELIMINARY STATEMENT

      Plaintiff, bring this action under 18 USC §§1961 (C) and (D) and 1964 (C), civil RICO

against defendants and other unknown associates, (hereinafter John Does 1-4), to redress the

financial harm and injury sustained to plaintiff's business and property, resulting from

defendants having committed acts and engaged in a pattern of conduct constituting extortion,

as defined under 18 USC §1951; mail fraud, in violation of 18 USC §§1341; and assault, as

defined under N.Y. Pen. L. §120 05. Defendants, are the principles, employees and associates-

in- fact of Mintz and Fraade L.LP, a law firm, that also engages in subletting and maintains

office space, in midtown Manhattan. For at least the last 10 years, Mintz and Fraade , and

continuing to date, have unjustly enriched themselves by unlawfully gaining monies and

1

property of subtenants , and others, including plaintiff, through activities that include: the actual and threatened use of force; instilling fear of economic harm; misrepresentation, scheme or artifice to defraud; and the commencement of frivolous eviction proceedings. Plaintiff seeks injunctive relief, treble damages, and attorneys fees.

Defendants Fred Mintz and Alan Fraade, principles in the law firm of Mintz & Fraade, have for a number of years also engaged in the business of subletting office space in the portion of the building for which they lease, to other lawyers who are mostly solo practitioners, and to increase the profits over and above the exorbitant rents charged, by forcing the sub-tenants to pay additional amounts for necessary services, which defendants previously represented to the sub-leasee existing access through misrepresentation and fraud; and, in collecting monies for increases in utilities and other costs far in excess of that billed by the utility company, by allotting percentages of the pro-rated shares of the increase far in excess of 100%, through mail and wire fraud. On those occasions when plaintiff questioned defendants' practices, plaintiff's associates were threatened and physically harmed through the use of force, and plaintiff's use of leased office space was restricted by the defendants maliciously cutting off necessary office services, such as use of running water and a sink, use of the office kitchen, access to a cooler and bottled water, air-conditioning, and curtailing plaintiff's use of the conference rooms to meet clients. As a result, plaintiff has sustained injury and harm to his business and property, and has lost clients and calls. Moreover, plaintiff seeks treble damages, and attorneys fees pursuant to 18 USC 1964 (C).

## II. JURISDICTION AND VENUE

1.      Jurisdiction lies in a District Court pursuant to 15 USC §26 and 28 USC §1337. Venue is proper in the Southern District of New York because all of the acts and events giving rise to this action occurred in this district.

### III. PARTIES

2.      Plaintiff James LeBow is the principal of the Law Offices of James B. LeBow, and the leasee/sub-leasee of the office space at the premises known as 488 Madison Ave, Suite 1100, New York, NY 10022. Plaintiff signed an eight-year sublease for space which includes two offices and two secretarial cubicles, on or about February 5, 2007. Plaintiff sublets the space from Mintz & Fraade, LLC, a law firm holding the direct lease for almost one-half of the eleventh floor. Mintz & Fraade does not let office space collateral to its law practice, but rather as a business in and of itself; defendants' firm occupies only three out of the 25 windowed offices for the practice of law. The rest of the sublets are mostly for solo practitioners. Six months into the eight-year sublease, Mintz & Fraade made increasingly aggressive overtures that plaintiff agree to pay for additional services over and above those offered in the lease agreement, which plaintiff did not need, desire, or want to subscribe to. This included the offered coffee service, early mail delivery, and the monthly use of Mintz & Fraade copying service. After resisting defendants' pressured offers, defendants then implemented the second phase of their scheme of extorting added money from plaintiff, through fear of physical force and financial harm (such as threatening an imminent eviction), intended to inflict injury and harm to plaintiff's business and property. Plaintiff is a resident and citizen of the City and State of New York, and of the United States.

3

3.     Defendant, Fred Mintz, is the principal attorney of Mintz & Fraade, LLC, a law firm

located at 488 Madison Ave, Suite 1100, New York, NY 10022.  The firm of Mintz & Fraade

has been in existence in one form or another, for the last 20 years.  Besides Mintz, who directs all

of the firm's operations, the firm consists of four other lawyers, three of whom are associates

fresh from law school.  Mintz also requires his associates to work a minimum of 12-hour days, in

addition to requiring his associates to obtain daily permission before having lunch.  The firm

practices in the area of corporate law.  Its leasing of office space as a business enterprise

commenced at least 10 years ago, and on information and belief, up to nearly 20 years ago.

However, Mintz and Fraade strategically decorate the space in such a manner, as to intentionally

construct the façade that the other solo law practitioners occupying the remaining 23 windowed

offices are part of the law firm of Mintz & Fraade.  On information and belief, Fred Mintz is a

resident of the state of New York, and a citizen of the United States.

4.     Alan Fraade is a partner in the firm of Mintz and Fraade LLC.  On information and

belief, Fraade has been with Mintz as either an associate, or a partner for more than 20 years.

Fraade has hands-on responsibility for all operations of Mintz & Fraade (including their office

sublet business), but only at the supervisory direction of Mintz, to whom Fraade must report over

the phone on an hourly basis.  Fraade is responsible for the showing of office space, negotiating

the sublease, and in enforcing the terms of the sublease - including hands-on responsibility for all

activities taken against a sub-tenant, such as the effort to extort extra monies, over and above the

price of the sublease.  These extortionary activities include directing others on his support staff to

use physical force against plaintiff and his employees, restricting all tenants' use of necessities

(such as running water, air conditioning, refrigeration, Internet access, the kitchen sink, and

4

garbage disposal in the kitchen), should the tenant fail to subscribe to the additional services offered by Mintz & Fraade. These additional services are offered at exorbitant prices, and are specifically intended to unjustly enrich Mintz & Fraade, and to allow defendants to reinvest this extra monies in their office rental business. As such, Fraade has been directly responsible for: the physical assault upon tenants, and assault with the use of a weapon; extortion through the use of threats; intimidation of tenants to induce fear of physical harm in order to extort money or property from a tenant; restricting and limiting necessary services to a sub-tenant for the purpose of inducing fear of financial harm, in order to obtain money or property from a tenant, by restricting and limiting the tenants' right to the use of necessities, including air-conditioning, refrigeration, running water, telephone service, and Internet access; as well as other criminal activities including, but not limited to, mail and wire fraud, honest services fraud, common-law fraud, misrepresentation, and money laundering. On information and belief, Fraade is its resident of the State of New York, and a citizen of the United States.

5.     Warren Pearl is an employee of the firm of Mintz and Fraade, and part of the firm's support staff, and has conspired with Mintz, Fraade, and others known and unknown, to commit extortion, assault, burglary, and other crimes in furtherance of the criminal enterprise of Mintz & Fraade. On information and belief, Mr. Pearl is a resident of the State of New York, and a citizen of the United States.

6.     Robert Chira is an attorney licensed to practice law in the State of New York. He has been retained to represent Mintz & Fraade, and as such, he has used his position to conspire, confederate, and agree with Mintz, Fraade, and others, known and unknown, to further the racketeering scheme of Mintz, by inducing fear of financial harm through: the threatening of and

5

bringing of frivolous and baseless lawsuits, executing summary proceedings for eviction, and writing letters threatening financial harm – all in a conscientious effort to further the extortionate scheme of defendants Mintz and Fraade.

## IV. BACKGROUND

At all times relevant herein:

7.      Mintz & Fraade LLC holds the lease to Suite 1100, 488 Madison Ave, New York, NY 10022, which totals approximately 15,000 square feet of office space, on the south end of the building.  On information and belief, Mintz & Fraade obtained much of the space piecemeal, by acquiring sublets and leaseholds reverting to the owner upon termination. The space itself is divided by décor into an East and West side, the Eastside facing Madison Avenue.  Mintz & Fraade's leasehold runs to 2015, another eight years.  This leasehold's space contains 23 windowed offices, another five interior offices, and 10 secretarial spaces.  There are two large conference rooms: one for the exclusive use of Mintz & Fraade, and one for all other subtenants.  There is also a smaller conference room which allows for four people to sit about a roundtable, a kitchen with a sink and refrigerator, a file room, and a reception area.  Mintz & Fraade as a law firm practices in the area of corporate law. The Firm consists of Mintz, Fraade, and three associates, who are hired to and obligated to work from at least 9 a.m. to 9 p.m., and at least five days a week.  A support staff of 1-2 secretaries, along with Warren Pearl, a non-lawyer kept in the file room, and a receptionist, completes the firm.  Mintz & Fraade places its associates in non-windowed offices, which were used as storage closets by the original tenant, before Mintz & Fraade acquired the space.  Mintz & Fraade occupy two windowed offices. Fraade occupies one of the smaller offices on the South side, while Mintz occupies the largest office on the floor,

6

equipped with a balcony overlooking St. Patrick's Cathedral. Mintz & Fraade also maintain

another interior office for those brief occasions when they have their office manager/bookkeeper

position filled. Mintz & Fraade seat defendant Warren Pearl in the file room. The rest of the

leased space is sub-leased. Although Mintz & Fraade represent in the lease that the entire office

space is leased to lawyers and law firms exclusively, that is not the case. In fact, an employment

agency presently sublets a large area where, Mintz & Fraade had falsely represented in their

lease, that there would be a law library. In addition to those amenities Mintz & Fraade agreed to

provide under the basic terms of the lease, invariably, each tenant will be aggressively pitched by

Fraade to take advantage of the added services available, for an extra price. Some of these added

services include, but are not limited to, the following: a coffee service, early-mail service, a

cleaning service, and extra storage space. Each service, again, was far in excess of the pro-rated

cost of the utilities. This added windfall of monies to Mintz & Fraade can amount to hundreds, if

not thousands of dollars a month, especially when utilities are involved. Mintz & Fraade have on

occasion simply passed along the high utility bills for any specific month to the subtenants by

increasing their rent, requiring each tenant again to absorb a pro rata share of a large utility bill

for which Mintz & Fraade are solely responsible, in the first place. Therefore, some of the utility

bills impose not only a burden on the subtenants, but they actually present a windfall in favor of

the defendants, because the pro rata percentages are skewed, and force the subtenants to pay

amounts exceeding 100% of the original utility bill. Over the years, Mintz & Fraade have taken

a dim view of sub-tenants who do not also subscribe to the added services offered by Mintz &

Fraade, and these sub-tenants have been regularly subjected to highly aggressive methods to

compel their subscription to the added services. Invariably, Mintz & Fraade have limited or

7

restricted the services available to the tenant - even the services provided for in the lease - including limiting the use of conference rooms, phone service, air-conditioning, and other services that induce fear of financial harm, usually to gain the cooperation of the subtenants. In limiting and restricting the subtenants' services, Mintz & Fraade have often used their employee Warren Pearl to physically re-take any and all equipment once provided to the subtenants to use the office services. Such a retaking scheme, being unauthorized by the lease, even by any lawful means, constitutes an unauthorized reentry into a subtenant's premises for the purpose of theft, which under the law of the state of New York constitutes Burglary in the third degree, in violation of NY Penal Law 165.40, a felony punishable by up to 15 years in a state correctional facility. Further, on occasion, Warren Pearl, at the behest and specific direction of both Mintz & Fraade, has confronted subtenants not readily willing to relinquish services which they were entitled to under the lease agreement. Mintz and Fraade have even engaged defendant Pearl to physically overwhelm subtenants in order to obtain the object, or objective desired by Mintz and Fraade, or to use any other means necessary to achieve Mintz and Fraade's objectives. Most subtenants to whom Mintz & Fraade have leased office space are solo practitioners over the age of 60, and most over the age of 65. These subtenants have been intimidated through fear of physical force and financial harm, into submitting to Mintz & Fraade's demands. These extortionate actions on the part of Mintz & Fraade have taken place for years with numerous subtenants.

8.      Mintz, Fraade, Pearl and Chira, and each of them, conspired, agreed and confederated with each other, and each with the other, and others known and unknown, to commit the above activities, and other activities to be described below, while participating in the enterprise of

8

Mintz & Fraade LLC, and furthermore engaged in a pattern of racketeering activities, committing at least two predicate racketeering acts, including: extortion, in violation of the Hobbs Act, 18 USC 1951; Burglary in the third degree, in violation of NY Pen. L. 16 5.40; mail fraud, in violation of 18 USC 1343 and 1346; money-laundering, in violation of 18 USC 1956; and, from assault in the second degree, in violation of NY.Pen. L. 120 .50; and other unlawful acts as will be described below, all in furtherance of the racketeering enterprise.

### V. THE ENTERPRISE

9.    At all times relevant herein, the law firm of Mintz & Fraade, LLC was a racketeering enterprise - as that term is defined in title 18 USC Section 1961(4) - which engaged in activities which affected interstate commerce.

### VI. THE RACKETEERING VIOLATION

10.    At all times relevant herein, defendants held positions as employees, principals, partners, shareholders, or associates-in-fact with an enterprise affecting interstate commerce; and with regard to those events described below, defendants, and each of them, did conspire, agree and confederate with each other, and each with the other, and with others known and unknown, to violate 18 USC 1962(C) by willfully, intentionally, and deliberately participating in - directly or indirectly – the affairs of the enterprise, by engaging in a pattern of racketeering activities, as that term is defined under 18 USC 1961(1), as follows:

a)  18 USC 1951(a);

b)  18 USC 1946;

c)  18 USC 1941;

d)  18 USC 1956;

9

As well as having engaged in acts or activities in violation of the New York State penal law, including, but not limited to:

16 5.45, burglary, in the third degree;

120 .05, assault, in the second degree; and

230 .05, fraud.

11.      As part and parcel of defendants having entered into the agreement as described above, defendants acknowledged and agreed - either tacitly, expressly, or both - to engage in and commit at least two racketeering acts, as that term is defined under 18 USC 1961(1)(A) and (B), in furtherance of the affairs of the enterprise.

### VII. THE DEFENDANTS' OBJECTIVE

12.      Defendants, while acting to further and promote the affairs of Mintz & Fraade, committed fraud, deceit, misrepresentation, and intimidation, including acts violating the laws of the United States and State of New York, for personal gain and to unjustly enrich themselves at the expense of their subtenants through defendants' price-gouging scheme, by severely inflating the costs for office services, and charging the subtenants for expenses not provided for in the sub-lease agreement.  The agreement also provides for costs to be shared on a pro-rata basis, but the total percentage charged by Mintz & Fraade to its tenants is several hundred percent in excess of the actual total costs.  In other words, each service provided for by Mintz & Fraade allowed defendants the opportunity - albeit unlawful and unethical -  to make another buck, and also allowing Mintz & Fraade to make substantial profits on everything from electricity, to the phone service, and even to the morning cup of coffee.  This has resulted in defendants aggressively soliciting the subtenants' subscription, purchase, and payment for additional

10

services offered, and meeting a subtenant's rejection for such additional services with a

progressive hostility. In some instances, defendants view a subtenant's refusal particularly

harmful, because one subtenant refusing the service could lead to many other tenants' refusal of

such additional services. In such instances, as well as others, defendants will engage in

activities, deliberately and intentionally, to induce subtenants' fear of both physical and financial

harm - which defendants employ - in order to force the subtenants' payments and future

compliance.

## VII. FACTUAL ALLEGATIONS

13.    That on or about February 5, 2007, plaintiff entered into a sublease agreement with Mintz

& Fraade, the defendant, for office space at 488 Madison Ave, Suite 1100, New York, New

York, 10022.

14.    The terms of the sublease agreement provided that plaintiff was to occupy two windowed

offices, and two secretarial spaces. The lease also provided for, as it did with all the other

subtenants, use of a conference room by appointment. The lease provided subtenants with a file

room for storage space; it allocated an area outside of plaintiff's offices, where file cabinets may

be placed; and the lease also provided for the use of the law library. There were additional

services which plaintiff was also to receive, but plaintiff would be required to pay amounts over

and above that specified in the sublease agreement for them. However, there were still services

which plaintiff had negotiated, and were included in the sublease agreement, which plaintiff,

unjustly, did not immediately receive.

11

15.    Firstly, throughout negotiations, and before an agreement was entered into, the plaintiff was unequivocally promised use of the library and telephone service with a receptionist, such as that provided to all the other subtenants. This was an imperative, critical, and material provision of the lease agreement.

16.    Plaintiff moved into Mintz & Fraade's suite, and for a number of months thereafter there were no complaints, despite Mintz & Fraade having only one of the two offices promised available - causing plaintiff's staff to make do by doubling up into one office, until both offices promised plaintiff to be available on February 5, 2007, were finally made available in or around May 2007.

17.    During pre-lease negotiations, plaintiff made clear that telephones answered by a receptionist was imperative as part of the lease. Fraade, who handled all details pertaining to the sublet, represented to plaintiff and his staff that phones being answered by a Mintz & Fraade receptionist were a standard service provided to the sublet offices, and was contracted for in the lease.

18.    However, neither of the offices plaintiff was to occupy, nor the two secretarial spaces, were equipped with phones, or a jack tying into the Mintz & Fraade phone line. Fraade represented it would be no problem to wire the offices and secretarial spaces into the phone line. However, after plaintiff moved into the space and made further inquiry about the status of the phones, Fraade asked if it was a necessity for plaintiff, because the Mintz & Fraade trunk line was full, and a new trunk line would have to be installed, and would cost Mintz & Fraade a thousand dollars or so.

19.    Plaintiff reiterated that a phone system and a receptionist were essentials to a desirable office space, and reminded defendant about the deal struck in negotiations. Fraade acknowledged that the phone was an integral part of the sublease agreement, and stated that the present trunk line was filled to capacity, and the installation of additional lines would be delayed until technical parts could be ordered and received. Again, plaintiff and his staff were willing to make do until the trunk line could be modified.

20.    As time progressed, the relationship between plaintiff's staff and Mintz & Fraade was not working out. Although plaintiff still did not have a telephone running through Mintz & Fraade's phone line and access to the law library, these services purported by defendant to be in the suite in negotiations was nothing less than a misrepresentation material to the sublease. Plaintiff, however, was content to let the trunk line be fixed and modified to accept plaintiff's phone lines.

21.    Up to August 2007, plaintiff had enjoyed use of all office facilities, as with all other subtenants, which included the use of the kitchen (which is the only sink with running water in the entire suite), the refrigerator, and at the most on two or three occasions, the use of the microwave. Plaintiff had also been eventually provided by Mintz & Fraade telephones on the Mintz & Fraade trunk line, answered by the receptionist. By June 2007, plaintiff had also moved into the second office, after having waited for occupancy for several months. The only apparent conflicts between plaintiff and Mintz & Fraade at this point was the progress of modifying the trunk line (to allow plaintiff and his staff adequate phone lines to service their clients), and also the lack of air conditioning in the second office, which Fraade repeatedly promised would be repaired.

13

22.    However, the few phones with which Mintz & Fraade supplied plaintiff were not

equipped with sufficient open lines and conference call capabilities. This often left plaintiff's

staff at their desks, without phones, and required them to be constantly in motion, between doing

their work and jumping up to answer the phone. After numerous inquiries made concerning the

phone lines, defendants consistently provided the excuse that the part needed to complete the

trunk line, purportedly ordered in February 2007, had still not arrived. The real reason was

discovered when plaintiff overheard a discussion between Fraade and Mintz, during a time when

the two thought they were alone, and Mintz informed Fraade that it was too expensive to modify

the trunk line in order to add plaintiff's additional lines. It was apparent therefore, that Mintz

and Fraade were fraudulently representing to plaintiff services which they had no intention of

even providing.

23.    In or around August 2007, members of plaintiff's staff complained to Fraade that

defendant Warren Pearl had thrown away their personal foodstuffs, which they had maintained in

the suite's common refrigerator. Not long thereafter, plaintiff and his staff were requested to join

the Mintz & Fraade coffee service, at a substantial cost per person per month. Upon polling the

staff, no one drank coffee other than occasionally, and on those instances, the coffee would

usually be drunk before coming to the office. Thus, plaintiff's office manager informed Fraade

that plaintiff nor his staff would not be participating in the Mintz & Fraade coffee service. At the

time, Fraade, about to leave for a vacation, stated only that someone had to drink coffee.

Plainitff's office manager, believing the statement was said in jest, continued to decline the

coffee service, and walked away. Two to three days later, Mintz, without warning or discussion,

sent a technician to disconnect plaintiff's Internet access. Further discussions with those

14

personally in touch with Mintz related that plaintiff's Internet access was being discontinued because, at that time, plaintiff was two days late with the rent payment for August. Plaintiff's office manager stated that such could not be the case, having paid the rent herself. She immediately took a Mintz & Fraade associate with her, went into Fraade's office, and pointed at his desk, where she had placed the August rent check. This check was positioned in the same place where she had placed it three days before, and the check's placement was witnessed by a Mintz and Fraade associate. Furthermore, Internet access is a service for which plaintiff pays a separate and additional amount separately.

24.     Mintz was then called by someone in his firm, and was informed of the presence of the rent check, apparently on the day due. However, a technician, who was still intent on disconnecting plaintiff's Internet access, locked the door to the office where the connection was located, because Mintz remained of the opinion that the rent was late, and that he was still entitled to discontinue plaintiff's Internet access.

25.     Several months after plaintiff sublet office space in the Mintz & Fraade suite, it became apparent to plaintiff and members of his staff that the additional amounts that Mintz & Fraade charged their subtenants for services and items not included in the sublease agreement were not even being provided to the Mintz & Fraade subtenants, at the additional cost. In fact, Mintz & Fraade have engaged in a pattern and practice for at least over 10 years of not only overcharging subtenants for such items, but in actuality, Mintz & Fraade have engaged in unlawfully gouging their subtenants of excessive prices ranging about 200% of the actual market value of the costs for such items; and that Mintz and Fraade and others, were substantially - albeit unjustly - enriched from providing to their subtenants services collateral to the subtenants agreement, to the

15

degree that defendants, and each of them, over the course of the existence of the racketeering

enterprise, did engage in, and commit violations of federal and state law in order to ensure that

such monies would continue, despite the unwillingness of subtenants to continue the services.

26.    Furthermore, defendants Frederick Mintz, Alan Fraade, Warren Pearl, Robert Chira, and

others known and unknown, being persons employed and associated with the racketeering

enterprise maintained by Mintz and Fraade, LLP (which enterprise was engaged in activities that

affected interstate and foreign commerce), unlawfully, intentionally, and knowingly conspired,

confederated, and agreed together and with each other to participate - directly and indirectly - in

the conduct of the affairs of the defendants' enterprise, through a pattern of racketeering activity

as that term is defined in Title 18, United States Code, Sections 1961(1) in 1961(5), which

pattern is set forth more fully below, as Racketeering Acts One through Four. It was further part

of the object of the conspiracy that each defendant agree to conspire to commit at least two acts

of racketeering activity in the conduct of the affairs of the enterprise.


## VII. COUNT ONE

## RACKETEERING


27.    Plaintiffs repeat and realleges the allegations contained above in paragraphs 1-26 as

though fully set forth with the same force and effect herein.

28.    Defendants, and others known and unknown, unlawfully, willfully, and knowingly did

commit, and attempt to commit extortion, as that term is defined in title 18, United States Code,

Section 1951(b)(2), by attempting to obtain money and property from, and with the consent of

16

plaintiff herein, whose consent was induced by fear, the use of actual or threatened use of

physical harm and violence, and the threat of or infliction of economic harm; and defendants

thereby would and did obstruct and delay commerce, and the movement of articles and

commodities in commerce, as that term is defined in title 18, United States Code, Section 1951

(b)(3), in that defendants, and others known and unknown, did use threats of violence, and

inflicted economic harm in an attempt to force plaintiff to accept lease terms and services, which

plaintiff had declined to accept or participate in, including: early mail delivery service, the coffee

service, use of the kitchen and its refrigerator and microwave, or using the copying services.

Mintz and Fraade did conspire and agree with others, known and unknown, to take the following

actions designed to induce fear of both physical and financial harm: by interrupting and

discontinuing plaintiff's Internet access; threatening summary eviction proceedings if plaintiff

did not enter into an agreement to buy out of the current lease; barring plaintiff and staff from

use of the common areas such as the kitchenette area; preventing plaintiff from using

refrigeration, running water, the sink, and the microwave oven maintained in the suite; and,

directing Warren Pearl to deprive plaintiff of the use of the phone system.


## The Pattern of Racketeering

29.        The pattern of racketeering activity by the defendants, as defined in title 18,

United States Code, Sections 1961 (1) and 1961(5),consisted of the following acts:

### Racketeering Act # One – Extortion of Plaintiffs


17

30.    From at least in or about the year 2000, up to the period of August 2007, defendants

Frederick Mintz, Alan Fraade, Warren Pearl, and others committed the following acts of

racketeering, any one of which alone would constitute the commission of Racketeering Act

Count One:

a. In or around July 2007, defendants did conspire with others known and unknown, to

threaten both physical violence and economic harm by entering plaintiff's office, tools in hand,

and threatening to interrupt and discontinue plaintiffs' Internet access, immediately after plaintiff

refused to consent to participate in defendants' monthly coffee services.

b. On or about the morning of August 27, 2007, defendants used actual force upon

plaintiff's staff member, when defendant Warren Pearl, at the direction of Mintz and Fraade,

forcefully and unlawfully removed telephones from plaintiff's office.  This order came as a result

of plaintiff refusing to comply with defendants' extortion practices, in not paying for the

additional office charges such as for coffee service and early mail delivery.  However, at all

times, plaintiff complied with the lease agreement and paid for the rent and other necessary

services which plaintiff had actually agreed to, such as Internet access.  Pearl physically

assaulted plaintiffs' employee and threatened physical harm to another employee, in carrying out

this conspiracy.  This incident is set forth in greater detail in Racketeering Act Count Two set

forth below.

c. In or about August 2007, and until the present time, defendants barred plaintiff and his

staff from use of the common areas such as the kitchenette area, and preventing plaintiff from

using refrigeration, running water, the sink, and the microwave oven maintained in suite.  When

plaintiff subsequently brought in his own refrigerator and microwave to compensate for these

losses, defendants advised plaintiff that possessing these items in their leasehold was in violation

18

of the lease and that they must be removed immediately. However, there was no such specification in the lease. Obviously, defendants were and still are attempting to force plaintiff to acquiesce to their demands (such as extorting additional monies from plaintiff), by depriving plaintiff of any means of storing or preparing food during the work day.

d. Defendants have sent various memos and letters threatening summary eviction proceedings if plaintiff did not enter into an agreement to buy out of the lease. Specifically, when defendants realized that plaintiffs would continue resisting their demands and threats to subscribe to additional services and pay additional monies to defendants, defendants employed another tactic – using their legal expertise and relationships, and superior financial position to scare plaintiffs to leave (presumably to bring in another tenant who would be easier to extort money from). Defendants sent various memos advising plaintiffs that they were in breach of the lease agreement, and therein fabricated various conditions that, if they indeed existed, could possibly constitute a breach. This onslaught of memos regarding fabricated conditions culminated in a lengthy letter from defendant Chira, an attorney in the same office space but who maintains his own letterhead, which contained all of these fabricated breaches. After proclaiming that defendants were in a position to commence and prevail in an action to evict plaintiffs, the letter concluded by saying that the defendants would prefer to negotiate a buy-out agreement, than to "exercise their right to terminate the lease." This unlawful and unjustified threat was a clear attempt at extortion by defendants since they have no legal basis for terminating the lease.

### Racketeering Act #Two

### Trespass, Burglary, and Assault and Battery of Plaintiffs' Employees

31.    On or about the morning of August 27, 2007, as described in paragraph 30b above, defendants did conspire to forcefully enter into one of plaintiff's offices and remove property from that office, and to employ physical force and threats of further physical harm to plaintiffs' employees, in furtherance of this conspiracy.  The details of the incident are as follows:

Defendants Mintz and Fraade, upon information and belief, ordered defendant Warren Pearl to enter plaintiffs' offices, where plaintiff's associates were working, and remove the office telephone.  Defendant Pearl first attempted to gain entry by deceit, by stating that defendants had forged an agreement with plaintiffs' office manager to relinquish the phones.  Plaintiff's employee refused Pearl entry and informed Pearl to wait 30 minutes and discuss the matter with the office manager herself.  Pearl threatened to force his way into the office and remove the phones, but relented initially and went back into Mintz's office, where he presumably consulted with defendants Mintz and Fraade about what actions to take next.  Within minutes, Pearl returned.  Prior to his return, plaintiff's employees had closed the door to their office to prevent defendants from carrying out their threatened actions.  Pearl forced the door open, and then shoved aside plaintiffs' female employee, who attempted to block his entry into the office.  Pearl then shoved the said young woman a second time, this time with such force that she was shoved into and partially on top of her desk.  Pearl then grabbed the telephone that was in said employee's hands.  At this point, another of plaintiffs' employees in the office stood up to intervene, at which point Pearl threatened to beat him over the head with the phone if he did not sit back down.  The first employee then relented to Pearl, who was much larger and physically stronger than she, for fear of being further injured, and let go of the phone.  Pearl then left the office, phone in hand, and returned to caucus with the other defendants.

20

Since that time, plaintiffs' employees, particularly the young woman who was physically

assaulted, desires to work away from the office since she is fearful of defendants, and feels stress

and discomfort in their presence. Also, this same employee has had to frequent a physical

therapist on numerous occasions, and has had to take pain medications since she was assaulted,

and plaintiffs have unfortunately and unjustly had to bear these additional expenses, as a result.

### Racketeering Act #3

### Mail Fraud and Extortion

32.     In or around September 2007, that defendants, and each of them, and others, known and

unknown, unlawfully, willfully, and knowingly did combine, conspired, confederate, and agree

together and with each other to commit mail fraud, in violation of Title 18, United States Code,

sections 1941 and 1946, did engage in a scheme or artifice to defraud, to deprive plaintiff of

money and property, which defendants furthered through the use of the United States mail, in

that defendants did represent to plaintiff, through memorandum, that M & F had been advised

of and incurred a "one-time rent increase of over $ 1800 due to the rising costs of electricity…",

the M & F memorandum went on to advise that because the amount was billed as a "one-time

increase to M & F's rent, that pursuant to the sublease agreement between M & F and plaintiff,

that a 18% share of said "one-time rent increase" could and would be passed along to plaintiff.

Defendants also attached a copy of a letter, purportedly written and disseminated by the energy

consultants, Honing and Honing, and sent to M & F on behalf of Jeffrey Management Company,

Building Manager for the premises 488 Madison Ave, New York, New York. M & F then

further advised plaintiff in their memorandum, that plaintiff should remit to M & F a sum

amounting to more than $500 dollars for the one-time rent increase imposed on it. Further,

defendant Robert Chira, Esq., also an M & F subtenant, who represents Mintz and Fraade, LLP., against plaintiff, and is associated-in-fact with the racketeering enterprise, did make further demand upon plaintiff in writing to pay an 18% share of the total of the "one time rent increase …", at the threat of default, and summary proceedings for eviction, and thereafter did mail the writing to plaintiff, through the United States mail.

The aforementioned actions by defendants, and each of them, was a knowing, willful, an intentional scheme to defraud plaintiff of money and property, resulting in the unjust enrichment of M & F through fraud and misrepresentation of the purpose, amount, and nature of the monies sought from plaintiff by M & F, all of which was a violation under 18 USC §1341, mail fraud, and as such defendants' engaged in and committed a predicate racketeering act as that term is defined under 18 USC §1961 (1)(B).

On information and belief, the defendants' foregoing racketeering acts to the Plaintiff's detriment are merely one example of a broader, long-term, ongoing scheme to acquire money and property. Defendants racketeering acts have continued for a period of over six (6) years, and due to the regular, ongoing, and systematic nature of the exploitation of the enterprise, there is a specific threat of repetition of the criminal and racketeering activity in the future. There is a implicit, if not manifest, likelihood that such racketeering will continue through the 2007 year and beyond.

Plaintiff has suffered damages in an amount in excess of 250,000 dollars, being calculated on the basis of Plaintiff's lost income from the loss of potential clients, out-of-pocket expenses, and the lost productivity of employees as a direct and proximate result of defendants' racketeering-related acts ; and Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages he has sustained and his costs of suit, including reasonable attorney's fees.

## COUNT II

### (Violation of 18 USC §1962 (d))

.       Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs as if fully restated hereinafter.

Defendants, and each of them, combined, conspired, confederated and agreed in violation 18 USC §1962 (d) , to engage in a pattern of racketeering activity with the intention of extorting and  defrauding Plaintiff of money and property, and to intimidate his employees. There is a relationship between the actions that each defendant has taken and the overall objectives of the conspiracy. There appears to be continuity in regards to the pattern of racketeering acts in furtherance of the conspiracy, which, on information and belief, commenced, at least by the date of in or about May of 2000 and is still ongoing at the current date.  A continuing threat of criminal activity exists in regard to the conspiracy, which has been facilitated through the enterprise. While the full and ultimate details of the conspiracy are within the knowledge and control of the defendants, it can be determined from the allegations above that each defendant conspired to act on behalf of the enterprise, and to directly or indirectly implement and facilitate the pattern of racketeering acts used to further the operation of the enterprise.

The defendants agreed that their racketeering acts would be committed on behalf of the conspiracy, and they agreed to participate in the conspiracy knowing that two or more predicate acts would be committed in furtherance of the same.

Pursuant to 18 USC §1964 ( c) Plaintiff is entitled to recover threefold the damages he

23

has sustained and his costs of suit, including reasonable attorney's fees.

## PRAYER FOR RELIEF

Plaintiff, James B . LeBow,  demands  judgment and other relief as follows:

    A. For his damages as proven at trial;

    B. For treble damages;

    C. For reasonable attorneys' fees;

    D. For his costs;

    E. Trial by jury; and

    F. For such other relief as this Court deems just and proper.


Dated: New York, New York          Respectfully Submitted,
       October 12, 2007

                          James B. LeBow (JL4535)
                          Pro se
                          488 Madison Ave., Suite 1100
                          New York, NY 10022